UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 1:18 CR 722 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| QUENTIN FIPS, | ) | |
| | ) | |
| Defendant | ) | ORDER |

Currently pending before the court in the above-captioned case is Defendant Quentin Fips's ("Defendant" or "Fips") Motion to Suppress. (ECF No. 18.) The court held a Hearing on the Motion on February 12, 2020. For the following reasons, the court grants Defendant's Motion.

## I. BACKGROUND

**A.     FACTS**

The parties agree on the following facts: At around 8:21 p.m. on September 7, 2018, approximately seven members of the Cleveland Police Gang Impact Unit were patrolling the west side of Cleveland in several unmarked vehicles to monitor undercover drug buys and suspected gang activity. (*See* Mot. to Suppress at PageID #80, ECF No. 18.) As the patrol turned onto West 49th Street, the officer in the lead vehicle, Sergeant Alfred Johnson ("Sergeant Johnson"), observed Fips standing near a parked Buick sedan and talking to another person. (*Id.*) Fips reached inside the Buick as the police turned onto the street, which prompted Sergeant Johnson to stop abruptly and bring the

patrol to a halt. Sergeant Johnson exited his vehicle, approached Fips, and asked why he reached inside the Buick. (*Id.*) During this encounter, the police discovered a firearm and a bag of suspected crack cocaine and arrested Fips. (Gov't Resp. at PageID #111–12, ECF No. 26.) A subsequent search also turned up a digital scale in the back of the car. (*Id.* at PageID #112.)

While the parties agree on this basic version of events, they present sharply different accounts of how the police discovered the firearm and crack cocaine. At the suppression hearing, Sergeant Johnson testified that Fips did not give a coherent answer when asked why he reached into the car. Instead, Johnson claims that Fips opened the car door and said "this is what I was doing" before reaching into the car, moving various objects around, and then "accidentally" opening the center console and revealing the firearm inside. (*Id.* at PageID #111.) Sergeant Johnson testified that he saw the firearm through the car window and immediately pulled Fips out of the car to get him away from the gun. Officer Andre Bays ("Officer Bays"), who had exited his car and followed behind Sergeant Johnson, testified that he saw Fips free himself, start to flee, and throw the bag of suspected crack cocaine before officers arrested him.

Fips, however, testified that he never opened the car door or reached inside after the officers stopped their vehicles and began to approach. He said he raised his hands, held out his cell phone, and told Sergeant Johnson that he had reached through the open driver's window to retrieve his phone, which had been connected to a charging cable inside the car. Fips claims that Sergeant Johnson then looked inside the car with his flashlight, opened the car door, and lifted the lid to search the center console. With the firearm revealed, Fips asked whether he was being detained and took a step backward, at which point officers tackled him. According to Fips, the police discovered the drugs and scale only after officers took him into custody, patted him down, and unlawfully

searched the car.

Pursuant to the Gang Impact Unit's policies and practices, none of the officers were wearing body cameras or microphones during their encounter with Fips. Consequently, there are no audio or video recordings of these events.

**B.     PROCEDURAL HISTORY**

The United States indicted Fips on December 4, 2018, on one count of felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), one count of possession with intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (Indictment, ECF No. 1.) Fips filed his Motion to Suppress the evidence on July 15, 2019, and the Government submitted its Response in Opposition (ECF Nos. 18, 26) on December 6, 2019. On February 12, 2020, the court heard testimony from the parties regarding Fips's Motion.

## II.  LEGAL STANDARD

The Fourth Amendment protects against unreasonable searches and seizures by generally forbidding the introduction in court of evidence obtained by government officers through a violation of the Amendment. *Olmstead v. United States*, 277 U.S. 438, 462 (1928). To safeguard this right, evidence secured through an illegal search or seizure may not be used in criminal proceedings. *Mapp v. Ohio*, 367 U.S. 643 (1961). Although the Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands," the exclusionary rule "operates as 'a judicially created remedy . . . through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" *United States v. Leon*, 468 U.S. 897, 906 (1984)

(quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

It is well-settled under the Fourth Amendment "that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted). As relevant here, the plain view doctrine allows police, consistent with the Fourth Amendment, to seize an object without a warrant "if police are lawfully in a position from which they view [the] object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object." *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). Under the automobile exception, officers "may search a vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime." *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (internal quotation marks omitted). Similarly, "[i]t is settled law that the police may conduct an inventory search of an automobile that is being impounded without running afoul of the Fourth Amendment." *United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012).

### III. LAW AND ANALYSIS

The parties do not dispute the relevant law or its application. Rather, this case turns on the facts—specifically, how the police officers discovered the firearm in Fips's car. (*See* Mot. to Suppress at PageID #80, ECF No. 18.)

If the Government's factual account is true, then there was no Fourth Amendment violation requiring suppression of evidence. While the officers had neither a warrant nor Fips's consent to conduct a search, the Government nonetheless argues that the officers' actions were lawful given the chain of events that occurred. Under this version of events, Sergeant Johnson and the other officers

"were lawfully present next to Defendant's vehicle and conducting a consensual encounter." (Gov't Resp. at PageID #114, ECF No. 26.) Then, after Fips revealed the firearm through his own actions, the "detectives could lawfully seize the firearm" because it was in plain view. (*Id.* at PageID #113–14.) And when Fips tried to flee and threw the bag of suspected crack cocaine, the officers had probable cause both to arrest him and to search his car for further evidence of a crime. (*Id.* at PageID #114.) The Government also argues that the subsequent search of the Buick was justified under the inventory search exception to the Fourth Amendment's warrant requirement. (*Id.*)

Notably, Fips does not challenge the Government's interpretation of the law. Instead, he argues that the plain view doctrine, automobile exception, and inventory search exception do not apply given his version of the underlying facts. After considering the record as a whole, the court finds that the greater weight of the evidence supports Fip's version of events. Therefore, the court finds Fips's argument well-taken.

Several aspects of the hearing testimony stand out: First, the record contains inconsistent, even contradictory, accounts of where Fips was positioned when the officers first saw him and whether Fips opened the door or reached in through the window. During direct examination, Sergeant Johnson could not recall whether the driver's window was up or down. He also testified that Fips initially was standing *behind* the vehicle when the police patrol turned onto West 49th Street. According to this testimony, it was only after Fips saw the police that he moved toward the front of the car and reached inside. But the police arrest report—which Officer Bays wrote based on his conversation with Sergeant Johnson—states that Sergeant Johnson observed Fips "immediately reach inside the driver's window as detectives turn[ed] southbound onto W. 49th" Street. (Police Report at PageID #84, ECF No. 18-1.) This report comports with Officer Bays's testimony that,

when he first saw Fips, Fips was standing beside the car by the driver's side rear passenger door. Second, it is not clear from the record when Fips supposedly opened the car door. Sergeant Johnson initially testified that, after Fips saw the patrol and moved from the back of the vehicle to the front, Fips reached into the car through the open driver's door. In other words, the door was open *before* Sergeant Johnson approached Fips. As Sergeant Johnson explained: "I could see him. The door was open and I wanted to see why he went to his vehicle so I wanted to ask him some questions." But when pressed on this point during cross-examination, Sergeant Johnson stated that Fips opened the driver's door *after* Johnson arrived by the car. Third, it would have been dark outside when the officers encountered Fips around 8:21 p.m.,[1] which would have limited visibility into the car and the center console. Of course, Sergeant Johnson testified that the driver's door was open and Fips was leaning into the car when he accidentally revealed the firearm. Presumably, then, the overhead light could have illuminated the car's interior. But that leads to another issue: several statements contradict the Government's account regarding Sergeant Johnson's positioning relative to the car, Fips, and the firearm. Sergeant Johnson testified that he stood by the driver's side front quarter panel while he looked into the car through the window. That position would have made it difficult to see into the console; it also means the car door stood open between Sergeant Johnson and Fips. Yet Sergeant Johnson asserted that, as soon as he saw the firearm, he immediately grabbed Fips and pulled him away from the car. The court finds it implausible that such a quick response was possible with the door in the way. Perhaps in an effort to clarify matters, the Government elicited testimony from Sergeant Johnson that, "as [Fips] moved I started to move also because I wanted to see exactly

---

[1] The court notes that the sun set at 7:50 p.m. on September 7, 2018. Fips's testimony that Sergeant Johnson had a flashlight and shined it into the car further corroborates this point.

what he was doing." But "movement" in this context means navigating around the car door to get behind Fips, which would have prevented Sergeant Johnson from seeing into the car. Just as Officer Bays testified that he could not see what happened at the center console because Fips and Sergeant Johnson were blocking his light of sight, Sergeant Johnson's vision would have been obstructed by Fips's body if they both stood on the same side of the door.

In short, unpacking the hearing testimony reveals several inconsistencies that cast doubt on the Government's version of events and give the court pause. Because Fips's account is logical, makes intuitive sense, and is better supported by the record, the court finds that Fips did not open the car door or the center console and, therefore, that Fips did not reveal the firearm. This conclusion is bolstered, not undermined, by Fips's criminal record. Although the Government challenged Fips's credibility at the hearing by listing his prior convictions, the court finds it more likely that someone with such an extensive criminal history would have given the excuse that Fips gave to Sergeant Johnson—"that [he] was grabbing [his] phone off the charger"—rather than become flustered and open the center console where the firearm could be easily seen.

Consequently, the court finds that the firearm was not in plain sight and that the police conducted an unlawful search of the vehicle when they discovered the firearm. All subsequently discovered evidence of Fips's criminal activity—including the bag of crack cocaine and the digital scale in the Buick—flowed from, and is tainted by, the initial violation of the Fourth Amendment. Accordingly, the court grants Fips's Motion to Suppress.

### IV. CONCLUSION

For the foregoing reasons, the court grants Fips's Motion to Suppress (ECF No. 18). In doing so, the court emphasizes the fundamental principle that "the law holds that it is better that ten guilty

persons escape than that one innocent suffer." *Coffin v. United States*, 156 U.S. 432, 456 (1895) (quoting 4 William Blackstone, Commentaries at 358). While this maxim sometimes frustrates the prosecution of a defendant caught red-handed engaging in illegal activity, as is the case here, that is the price society pays to ensure government officials remain accountable and liberty remains a reality rather than a theoretical abstraction.

      IT IS SO ORDERED.

                                               */s/ SOLOMON OLIVER, JR.*
                                               UNITED STATES DISTRICT JUDGE

September 30, 2020